# In the United States Court of Federal Claims

No. 11-39C

(Filed Under Seal: May 20, 2011)
(Reissued: May 27, 2011)

| | |
|---|---|
| **VANGUARD RECOVERY ASSISTANCE, JOINT VENTURE,** | Protest of procurement actions taken by Federal Emergency Management Agency; standing; timeliness of suit; amendment and supplementation of the administrative record; agency's failure to provide for performance-evaluation reports regarding predecessor contracts, as required by FAR §§ 36.604, 42.1502(f); "too close at hand to ignore" doctrine |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **AECOM SERVICES INC., FLUOR ENTERPRISES, INC., NATIONWIDE INFRASTRUCTURE SUPPORT TECHNICAL ASSISTANCE CONSULTANTS, LLC, and CH2M HILL-CDM PA TAC RECOVERY SERVICES,** | |
| **Defendant-Intervenors.** | |

Michael A. Gordon, Michael A. Gordon PLLC, Washington, D.C., for plaintiff.  With him on the briefs was Fran Baskin, Michael A. Gordon PLLC, Washington, D.C.

Jeffrey A. Regner, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

Lee P. Curtis, Allen Cannon III, W. Hartman Young, Emily C.C. Paulin, and Maggie L.C. Greenlee, Perkins Coie LLP, Washington, D.C., for defendant-intervenor Fluor Enterprises, Inc.

William A. Roberts, III, Wiley Rein LLP, Washington, D.C., for defendant-intervenor AECOM Services, Inc.  With him on the briefs were Daniel P. Graham, Brian Walsh, and Julie A. Dunne, Wiley Rein LLP, Washington, D.C.

Samuel B. Knowles, DLA Piper LLP, Washington, D.C., for defendant-intervenor CH2M Hill-CDM PA TAC Recovery Services.

Joseph J. Petrillo, Petrillo & Powell PLLC, Washington, D.C., for defendant-intervenor Nationwide Infrastructure Support Technical Assistance Consultants, LLC.  With him on the briefs were Karen D. Powell and Sophia Z. Watson, Petrillo & Powell PLLC, Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Judge.

In this post-award bid protest, plaintiff Vanguard Recovery Assistance ("Vanguard") alleges that the Federal Emergency Management Agency ("FEMA") improperly evaluated proposals in a multi-award procurement of architect-engineering services to support public assistance in responding to natural disasters.  Compl. ¶ 1.  Specifically, Vanguard alleges that in awarding contracts for such services FEMA did not consider negative past performance information on incumbent contractors which was "too close at hand" to ignore, failed to follow its own selection guidelines, and did not adequately document the reasoning for its selections, in contravention of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Compl. ¶¶ 2(a), (d)(v), (e).  Each of the four recipients of the procurement contracts, Fluor Enterprises ("Fluor"); Architecture, Engineering, Consulting, Operations and Management ("AECOM"); Nationwide Infrastructure Support Technical Assistance Consultants ("NISTAC"); and CH2M Hill – CDM PA-TAC Recovery Services ("CCPRS") has intervened in the protest.  Pending before the court are the defendant's and defendant-intervenors' motions to dismiss and the plaintiff's motion to supplement the administrative record.  Disposition of the motions turns in substantial part on, and is complicated by, the circumstance that three prior protests of the procurement were filed sequentially with the Government Accountability Office ("GAO") before the case was filed in this court.

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal.  The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before May 26, 2011.  A hearing on proposed redactions was held on May 27, 2011.  The resulting redactions are shown by asterisks enclosed within brackets, i.e., "[***]."

# BACKGROUND[2]

## A. *FEMA'S Initial Procurement Actions*

On February 19, 2009, FEMA issued a Source Selection Notice, No. HSFEHQ-09-R-0411: PA TAC III, stating its intent to award up to four contracts to firms "to provide architect-engineer, consultant, and other professional services in support of the Public Assistance (PA) Program under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. [§§] 5121-5206." AR 2-2 (Source Selection Notice).[3]  The notice explained that selected firms must be ready to "support FEMA PA operations" and "augment FEMA's capacity to respond to natural catastrophes, [including] riverine and coastal flooding, tornadoes, hurricanes, typhoons, earthquakes, and tsunamis, or regardless of cause, any fire, flood, or explosion." *Id.*

The Source Selection Notice specified that bidders would be evaluated in two phases. First, bidders had to submit a standard form ("SF") 330. AR 2-3. Those "shortlisted" following evaluation of written materials would then be invited to make oral presentations after which the shortlisted firms would be re-evaluated. *Id.*

Five factors were considered in the selection of firms: (1) specialized experience and technical competence, (2) capacity to accomplish work within required time, (3) professional qualifications, (4) past performance, and (5) location in the general geographical area of FEMA's projects and knowledge of the locality of the projects. AR 2-3 to 5. Factor 1 was divided into three sub-parts: (a) experience developing reliable cost estimates for a variety of major multi-million dollar construction projects and/or repair of damaged infrastructure systems, (b) experience in evaluating projects for compliance with environmental regulations and preparing environmental documents, and related activities, and (c) experience in staffing at the "levels in Evaluation Factor 2." AR 2-3 to 4. Bidders were told that "Criteria 1 through 3 are equally important and are more important than Criteria 4 and 5. Criterion 4 is less important than Criteria 5. These five criteria will be used to evaluate firms' SF 330s. An unacceptable rating in any factor for Criteria 1 through 3 will result in an unacceptable rating overall." AR 2-3. Additionally, subfactor 1(a) was considered "significantly more important" than subfactor 1(b). *Id.*

---

[2]For the purposes of resolving these motions, the court presumes that allegations in Vanguard's complaint are true. The factual recitations provide a basis for analysis of the pending motions and do not at this preliminary stage of the case constitute full-fledged findings by the court. However, many of the recitations are drawn from the administrative record of the procurement, and that record provides factual grounds for resolving the parties' jurisdictional contentions.

[3]"AR __" refers to the administrative record filed with this court in accord with RCFC 52.1(a). The administrative record has been subdivided into tabs. The first number in a citation to the administrative record refers to a particular tab, and the number after the hyphen refers to the particular page number of the administrative record, *e.g.*, "AR 5-26." The pages of the administrative record are paginated sequentially without regard to the tabs.

Despite the differing hierarchy of importance, some of the factors appeared to overlap. The most important element, subfactor 1(a), addressed technical expertise in "developing reliable cost estimates" for reconstruction and repair work and thus combined an assessment of experience with past results:

> Experience developing reliable cost estimates for a variety of major multi-million dollar construction projects and/or repair of damaged infrastructure systems (e.g., buildings, roads, schools, hospitals, and power and water systems, etc.).   Cost estimates should reflect the total budget necessary for the project.  *Give a detailed explanation of the reasons for any variances that exceed plus or minus 10 percent between estimated and actual costs.*

AR 2-3 to 4 (emphasis added).  Contrastingly, respecting its evaluation of past performance under factor 4, the least important factor, FEMA advised and instructed that the accuracy of past cost estimates would also be assessed:

> PAST PERFORMANCE.   The agency *will evaluate the firm's past performance on contracts* of similar size, type, and scope with Government agencies and private industry *in terms* of project management, *accuracy of costs estimates*, cost control, quality control, completion of projects within budget, and compliance with performance schedules.   The firm must provide references for at least five contracts within the past three (3) years with names, affiliations, and telephone numbers, with a narrative discussion.   If the firm is a Joint Venture, contracts performed by its individual members must be included.   In the case of a firm without a record of relevant past performance or for whom information on past performance is not available, the firm will not be evaluated favorably or unfavorably on past performance.  *The Government reserves the right to use information outside of the response in evaluating past performance, including agency knowledge of the firm[']s performance.*

AR 2-4 to 5 (emphasis added).

FEMA received nine offers in response to the solicitation.  Def.'s Mot. to Dismiss ("Def.'s Mot.") at 4.  Seven bidders were selected for the shortlist and included in the final rankings and ratings, namely, (1) Vanguard, defendant-intervenors (2) Fluor, (3) AECOM, (4) NISTAC, and (5) CCPRS, plus (6) Shaw-Parsons Infrastructure Recovery Consultants ("Shaw-Parsons" or "IRC"), and (7) PB Americas ("PB").  *Id.*  Three of the bidders, Fluor, AECOM, and NISTAC held incumbent contracts.  *Id.*

FEMA rated and ranked the offerors under the five factors, using adjectival ratings for each factor and subfactor: superior, acceptable, unacceptable, and also for past performance, neutral. *See, e.g.*, AR 40-4310 (Source Evaluation Notebook Addendum Attachment F: Vanguard) (describing the adjectival ratings scale).

On June 15, 2009, FEMA announced its decision to award the four available contracts to Fluor, AECOM, NISTAC, and Shaw-Parsons.  In response to an unsuccessful bidder's protest at the agency level, FEMA issued an addendum to the sources-sought notification on August 13, 2009, identifying changes to evaluation factor 1 and allowing the shortlisted firms to submit revised SF 330s.  AR 6A-40.1 to 40.2 (Amended Source Selection Notice); *see also* AR 105-5206 (*Shaw-Parsons Infrastructure Recovery Consultants, LLC*; *Vanguard Recovery Assistance, Joint Venture*, B-401679.4-.7, 2010 CPD ¶ 77, 2010 WL 1180085, at *3-*4 (Comp. Gen. Mar. 10, 2010) ("GAO's First Decision")) (describing the agency level protests).  The revised subfactor 1(a) stated:

> The firm is required to identify completed projects from the past five (5) years that demonstrate its experience developing reliable cost estimates for a variety of major multi-million dollar construction projects and/or repair of damaged infrastructure systems (e.g., buildings, roads, schools, hospitals, and power and water systems, etc.).
>
> In its project examples, *the firm must demonstrate its experience, methodology, and tools to estimate the total cost of projects* (e.g., labor, materials, and equipment), and its use of forward pricing models for multi-year projects. *The firm must also demonstrate its experience in developing and utilizing quality control measures to ensure the accuracy of its cost estimates.*
>
> *The firms are required to provide a detailed explanation of the reasons for any variances on the identified completed projects that exceed plus or minus 10 percent* between the estimated costs in the proposed solicitation and the actual costs of the completed project.

AR 6A-40.2 (emphasis added); *see also* AR 105-5206.  The addendum additionally established that subfactor 1(a) was "significantly more important" than subfactors 1(b) or 1(c) and that subfactors 1(b) and 1(c) were of equal importance with respect to each other.  AR 6A-40.2.  The Source Evaluation Board re-scored the bidders and, on October 6, 2009, selected Fluor, AECOM, CCPRS, and NISTAC for the awards, in effect replacing Shaw-Parsons with CCPRS. *See* AR 105-5207 to 5208.

## B.  *First GAO Protests*

Upon learning the results of the revised selection decisions, Shaw-Parsons and Vanguard filed protests with GAO in December 2009.  *See* AR 54-4601 (Shaw-Parson's First GAO Protest (Dec. 4, 2009)); AR 55-4623 (Vanguard's First GAO Protest (Dec. 7, 2009)).  Vanguard's

protest alleged that FEMA's "decision not to select Vanguard . . . was erroneous and in violation of law because FEMA failed to consider negative cost estimating accuracy experience and other experience and past performance information regarding the incumbent PATACs [Public Assistance Technical Assistance Contractors] under the Specialized Experience and Technical Competence and Past Performance factors that w[ere] 'too close at hand to ignore.'" AR 55-4623.

GAO rejected Vanguard's arguments in a final decision rendered on March 10, 2010. With respect to Vanguard's challenge to FEMA's ratings under subfactor 1(a), GAO ruled that Vanguard's protest was "misguided because it confuses the concepts of experience and past performance." AR 105-5216 (GAO's First Decision). GAO explained that "an agency's evaluation under an experience factor is distinct from its evaluation of an offeror's past performance," commenting that experience "focuses on the degree to which an offeror has actually performed similar work," whereas past performance "focuses on the quality of the work." *Id.* GAO also dismissed Vanguard's challenge to FEMA's ratings under factor 4, but, in doing so, it nonetheless noted that "FEMA [had] failed to incorporate any mechanism for measuring performance under [the PA TAC II] contracts, and . . . past performance information was not collected." AR 105-5218 (internal citation omitted). Although it described FEMA's "lack of oversight" as "troubling," GAO concluded that it could not "attribute knowledge to the agency evaluation team that it did not possess." AR 105-5218.

Concurrently, GAO sustained part of Shaw-Parson's challenge, agreeing that "FEMA's past performance evaluation was fundamentally flawed because it failed to consider the PPQs [past performance questionnaires] it [had] received regarding Shaw-Parsons' performance, as well as those of the other firms, and instead relied solely upon information contained in the firms' SF 330 submissions." AR 105-5209. While FEMA did not need to consider all past performance references, "PPQs in an agency's possession" constituted "past performance information too close at hand to ignore." AR 105-5210 (citing *Intercontinental Constr. Contracting Inc.-Costs*, B-400729.3, 2009 CPD ¶ 44, 2009 WL 540162, at *2 (Comp. Gen. Mar. 4, 2009)). GAO recommended that FEMA reevaluate the shortlisted firms, giving consideration to the PPQs it had received regarding past performance of the firms. AR 105-5218. FEMA conducted the recommended reevaluation, and the firms' rankings remained unaltered. Def.-Intervenors' Mot. to Dismiss ("Def-Intervenors' Mot.") at 9.

C. *Second GAO Protest*

Following FEMA's reevaluation in response to the first GAO protest, Vanguard requested and received a debriefing from FEMA, learning how the agency had implemented GAO's decision. *See* AR 110-5278 to 5283 (Vanguard Pre-Award Debriefing Summary (May 28, 2010)). Vanguard then filed its second protest before GAO, challenging FEMA's new assessment of Vanguard's proposal. Vanguard contended that "[t]he re-evaluation of Vanguard's Past Performance as 'Acceptable' is unreasonable based on FEMA's own conclusions. Had Vanguard received a Past Performance rating of Superior, it would have a substantial chance for one of the awards." AR 112-5290 (Vanguard's Second GAO Protest (June 2, 2010)). This time, GAO sustained Vanguard's protest, concluding that FEMA had "effectively penalized Vanguard for having submitted references for additional, less relevant

contracts and used what was an arbitrary score for the purpose of its evaluation." AR 134-5667 (*Shaw-Parsons Infrastructure Recovery Consultants*; *Vanguard Recovery Assistance, Joint Venture*, B-401679.8-.10, 2010 CPD ¶ 211, 2010 WL 3677164, at *8 (Comp. Gen. Sept. 8, 2010) ("GAO's Second Decision")). GAO recommended that the agency reevaluate Vanguard's past performance information and make a new source selection determination. AR 134-5674. FEMA took the corrective action recommended by the GAO.

The final rankings adopted by the Source Selection Authority showed that the shortlisted firms were in close contention ("S" indicates a superior rating and "A" indicates an acceptable rating):

| Amended Consensus Scores | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Factors | | | | | | | | |
| FIRM (by rank) | 1(a) | 1(b) | 1(c) | 1 | 2 | 3 | 4 | 5 |
| 1  Fluor | S | S | A | S | S | S | A | S |
| 2  AECOM | A | S | S | A | S | S | S | S |
| 3  CCPRS | S | S | A | S | S | A | S | S |
| 4  NISTAC | S | A | A | S | S | A | A | S |
| 5  IRC | S | A | A | S | A | S | A | S |
| 6  Vanguard | S | A | A | S | S | A | A | S |
| 7  PB | A | S | A | A | A | A | A | S |

AR 136-5716 (Source Selection Board Official Consensus Final Report (Oct. 25, 2010)); *see also* Def.'s Mot. at 5. The Source Selection Authority also ranked the offerors by factors to distinguish between proposals receiving similar rankings:

| **Final Rankings** | | | | | |
| --- | --- | --- | --- | --- | --- |
| **Factors** | | | | | |
| **Rank** | **1** | **2** | **3** | **4**[4] | **5**[5] |
| 1 | [***] | [***] | [***] | [***] | [***] |
| 2 | [***] | [***] | [***] | [***] | [***] |
| 3 | [***] | [***] | [***] | [***] | [***] |
| 4 | [***] | [***] | [***] | [***] | [***] |
| 5 | | | | [***] | [***] |
| 6 | | | | [***] | [***] |
| 7 | | | | [***] | [***] |

AR 135-5678 to 5688 (Source Selection Decision (Oct. 25, 2010)); *see also* Def.'s Mot. at 5. Notably, despite having received a superior rating under factors 1 and 2, Vanguard was not included in the rankings for those factors. All other offerors with superior ratings for a given factor were listed in the rankings.

### D.  *Third GAO Protest*

On November 10, 2010, FEMA informed Vanguard that it again had not been awarded a contract. Twelve days later, Vanguard filed its third GAO protest, arguing that FEMA's "evaluation panel and/or its advisors have lost objectivity and have taken improper actions to retain the PA TAC II incumbents and CCPRS in conducting the re-evaluation," and citing examples of how Vanguard allegedly was assessed improperly. *See* Pl.'s Mot. to Supplement the Administrative Record ("Pl.'s Mot. to Supplement") Ex. 11 at 1 (Vanguard's Third GAO Protest); *see also id.* at 2-14 (describing how Vanguard was evaluated and comparing those

---

[4]Elizabeth Zimmerman wrote in her Source Selection Authority Decision that she [***] under factor four. AR 135-5687. The SEB rated AECOM and CCPRS as "superior" and the other shortlisted firms as "acceptable." *Id.* Ms. Zimmerman noted that CCPRS and Vanguard's ratings were "on the borderline of Acceptable/Superior." AR 135-5686.

[5]The rankings for factor five appear to be entirely based on [***]. NISTAC and AECOM [***]. AR 135-5687 to 5688. Fluor and CCPRS [***]. *Id.* IRC and PB [***], and Vanguard [***]. *Id.*

evaluations with the evaluations accorded other bidders by FEMA).  Vanguard asked GAO to recommend that FEMA replace its evaluation team, reevaluate Vanguard's past performance, and reevaluate several of the other offerors' proposals.  *Id.* at 16.  Vanguard supplemented its protest on November 29, 2010, providing more examples of what it described as "disparate treatment" in the evaluation of Vanguard as compared with other firms.  *See* Pl.'s Mot. to Supplement Ex. 12 at 1 (Vanguard's Third GAO Protest Supplement).  Vanguard partially relied upon the declaration of a former FEMA employee, Marvin Altman, who described the existence of documents which would support Vanguard's position but which had not been presented to GAO.  *See* Pl.'s Mot. to Supplement Ex. 13 at 2 (Vanguard's Request for Additional Documents).  On January 3, 2011, Vanguard requested that GAO order FEMA to produce documents relating to its and other offerors' oral presentations, plus documents relating to PA TAC I past performance evaluations, which Mr. Altman's declaration suggested existed.  *See id.* Ex. 13 at 1-3.

### E.  *Proceedings in This Court*

Shortly thereafter, on January 12, 2011, Vanguard shifted forums and filed a bid protest in this court.[6]  Vanguard's complaint reiterated the theme of Vanguard's three protests before GAO, claiming that FEMA's evaluation of the offerors' reliable cost estimating and past performance was unreasonable, that the final rankings of bidders improperly departed from the requirements of the source selection notice, and that FEMA failed to objectively evaluate Vanguard's proposal.  *See* Compl. at 19, 20, 24, 28.

After the government filed the administrative record with the court, Vanguard moved to supplement the record with certain documents which had been before GAO but had not been included in the record, as well as evidence of poor past performance by incumbent contractors. Pl.'s Mot. to Supplement at 1.  The materials Vanguard seeks to be added include (1) two GAO reports rendered in 2008 on FEMA's Public Assistance program, (2) a number of declarations attesting to the existence of documents showing poor past performance of incumbent contractors, and (3) a Department of Homeland Security Inspector General's report relating to PA TAC II incumbent performance.  Pl.'s Mot. to Supplement 2-3.  Vanguard also requests, pursuant to its theory that certain past performance information was too close at hand to ignore, that FEMA produce an extensive set of documents, including (1) "'TAC Evaluation Worksheet' forms from all FEMA Regions, and/or any similar PA TAC contractor evaluation and rating documents, including emails," (2) "FEMA Project Worksheets . . . or summaries of revisions to include cost estimating spreadsheets indicating an increase from initial cost estimates exceeding [ten percent]," (3) "comments, inquiries, questions and/or complaints relating to inaccurate cost estimates and other performance issues involving work by the incumbent contractors" received from various government entities, (4) "final and draft responses to [various government entities] relating to inaccurate cost estimates and other performance issues involving work by the incumbent contractor[s]," (5) "quarterly performance evaluations of PA TAC I and II incumbent contractors relating to . . . poor performance issues," (6) "[c]omments, questions and/or complaints relating to . . . performance issues involving technical specialists," (7) "notices of

---

[6]As a result of this filing, GAO dismissed Vanguard's third GAO protest.  *See Vanguard Recovery Assistance-JV*, B-401679.11-.12 (Jan. 14, 2011).

dismissal of incumbent contractor employees or subcontractors deployed by incumbent contractors and explanations," (8) "reports relating to visits to/by FEMA Regional offices and field offices," (9) "all e-mails and other communications between [Source Selection Notification writer] Lorine Boardwine and PA TAC task monitors relating to the performance of incumbent contractors,"[7] (10) "all documents relating to Quality Assurance Surveillance Plans ('QASP') for each PA TAC contractor team and 'performance measurement' documents," (11) "all monthly status reports and/or Task Order Activity Reports prepared by the incumbents," (12) "all quarterly Partnering Meetings with PA TAC contractors," (13) "[a]ll documents relating to PA appeals, and arbitration submittals, involving applicant claims of improper cost eligibility determinations, inaccurate quantity estimates, improper unit costs, or lump sum items," (14) "all customer satisfaction surveys relating to the PA program . . . and . . . any FEMA response," (15) copies of the PA TAC I and II contracts, (16) "documents relating to the determination not to include a performance measurement tool in[] the 2006 PA TAC II awards," (17) "documents relating to the evaluation of incumbent performance on the PA TAC II contracts or other pre-solicitation analyses," (18) "documents relating to the evaluation of incumbent performance for the PPQs," (19) "all other documents relating to the performance of the incumbent PA TACs between 2004-[20]09 relating to cost estimating reliability and variance information and the assignment of unqualified, untrained, and/or incompetent PA TAC personnel," and (20) documents from defendant-intervenors "relating to their performance of the PA TAC contracts that were sent to FEMA." *Id.* at 22-27.  Vanguard additionally asks to depose Lorine Boardwine and the Source Selection Authority, Elizabeth Zimmerman. *Id.* at 27-28.

In the alternative, Vanguard has asked the court to remand the case to FEMA and to require FEMA to evaluate the performance of the incumbent contractors on their PA TAC contracts.  Pl.'s Mot. to Supplement at 29-30.  It notes that GAO "recognized that FEMA had violated federal regulations in failing [to] collect formal or evaluate past performance information for the PA TAC II contract." *Id.* at 29 (citing AR 105-5218 n.20 (GAO's First Decision) (noting that although performance evaluations were required under 48 C.F.R. ("FAR") § 36.604, they had not been created)).[8]

## I. JURISDICTION (STANDING)

The government raises a jurisdictional objection at the outset, arguing that Vanguard does not have standing to bring its claims.  To establish standing in a bid protest action in this court, the protestor must be an "interested party."  28 U.S.C. § 1491(b)(1).  Interested parties are

---

[7]Ms. Boardwine was the PA TAC Contracting Officer's Technical Representative, as well as the Source Evaluation Board Advisor and a member of the agency evaluation team in the procurement.  Compl. ¶ 59.

[8]FAR § 36.604 is part of FAR Subpart 36.6 which pertains to "Architect-Engineer Services."  Section 36.604 simply provides a cross-reference to another FAR provision:  "See 42.1502(f) for the requirements for preparing past performance evaluations for architect-engineer contracts."  In turn, FAR § 42.1502(f) is part of FAR Subpart 42.15, "Contractor Performance Information."  In pertinent part, Section 42.1502(f) specifies that "[p]ast performance evaluations shall be prepared for each architect-engineer service contract of $30,000 or more."

"actual or prospective bidder[s] or offeror[s] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *American Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)); *see also Distributed Solutions Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008); *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). To establish a direct economic interest, the protestor must show that it had a "substantial chance" of being awarded a contract. *Labatt Food Serv., Inc. v. United States,* 577 F.3d 1375, 1378 (Fed. Cir. 2009); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009); *Rex Serv. Corp.,* 448 F.3d at 1308. A showing of prejudice also is a necessary element for standing. *Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Bannum, Inc. v. United States*, 404 F.3d 1346 (Fed. Cir. 2005); *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002) ([S]tanding is a threshold jurisdictional issue. . . . [P]rejudice (or injury) is a necessary element of standing."). Non-prejudicial errors in the procurement process do not invalidate a procurement. *See Labatt Food Serv.*, 577 F.3d at 1380. In short, both economic interest and prejudicial injury are standing requirements of a bid protest. *Id.*[9]

The government claims that Vanguard lacks standing because "re-evaluati[ng] sub-factor 1(a) and factor 4, as urged in [Vanguard's] complaint, [would] not improve Vanguard's ranking above number six. . . . [E]ven if correct, Vanguard would not have a substantial chance of securing a contract." Def.'s Mot. at 8. According to the government, if Vanguard prevailed on its claims, its ranking under factor 1 could [***], and its ranking under factor 4 would rise to first. *Id*. at 10. The government argues, "Under the[se] hypothetical rankings, [***]. *Id.*

The SSN specified the relative importance of each of the five factors with respect to one another, but did not dictate the Source Evaluation Board's ("SEB's") use of firms' rankings across the five factors to derive a final ranked list of offerors. *See* AR 2-3. The government would employ a relatively mechanical ranking process to fill that gap. That mechanistic approach is particularly suspect because the Source Evaluation Board omitted to rank Vanguard for factors 1 and 2, even though it received superior ratings for those important factors. *See*

---

[9]This threshold inquiry into prejudice as a key element of standing begins with an assessment of the sufficiency of the allegations in Vanguard's complaint. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *id*. at 560-61 (Standing requires demonstration of (1) an "injury in fact" that bears (2) a "casual connection" to the conduct complained of, and which is (3) likely to be "redressed by a favorable decision."). The first two elements provide the focus for prejudice in support of standing in bid protest cases. *See Information Tech. & Applications*, 316 F.3d at 1319; *see also Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 694-96 (2010).

Standing is a jurisdictional pleading requirement, but it is not a purely pleading exercise. As with all jurisdictional facts, those relating to standing can be challenged, as they are here. At that point, the protestor is put to its proofs, and in this setting the protestor must show by a preponderance of the evidence that its allegations can be sustained. As the Supreme Court observed in *Lujan*, each of the three standing elements "are not mere pleading requirements but rather an indispensible part of the plaintiff's case. Each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." 504 U.S. at 561.

*supra*, at 8.  Vanguard also has mounted challenges to more than simply the SEB's analyses of subfactor 1(a) and factor 4.  *See, e.g.*, Compl. ¶¶ 2(d)(v), 76-78 (alleging use of "improper" and "unstated" criteria for evaluating firms); *id.* ¶ 80 (challenging CCPRS' ranking); *id.* ¶ 84 (challenging IRC's ranking).  As a result, the government's argument that Vanguard would not have a substantial chance of receiving a contract even if it prevailed on its challenges is unconvincing.  Vanguard was one of the seven offerors "shortlisted" by FEMA for detailed evaluation.  Given the close ranking of the offerors, even "the slightest shifting of a single adjectival rating could have significant impact not only on the ranking of a given protester, but also on who they might be compared with in a tradeoff analysis."  *Serco Inc. v. United States*, 81 Fed. Cl. 463, 501 (2008).[10]  Notably, in considering each of Vanguard's protests, GAO plainly believed that Vanguard had standing to challenge the award.  *See generally* AR 105-5201 to 5220 (GAO's First Decision); AR 134-5657 to 5677 (GAO's Second Decision); *Vanguard Recovery Assistance-JV*, B-401679 .11-.12 (Jan. 14, 2011).

Were Vanguard to prevail on its claims, it would have a "substantial chance" of being awarded a PA TAC III contract, and it thus has a "direct economic interest" in the contract's award.  Vanguard also has made a sufficient threshold showing of prejudicial injury to establish that aspect of standing.  Accordingly, Vanguard has standing to challenge the procurement.

## II.  TIMELINESS (WAIVER)

The defendant-intervenors maintain that Vanguard's bid protest is untimely under an extended application of the timeliness and waiver rule of *Blue & Gold Fleet L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), and thus that this protest ought to be dismissed.  *See* Def.-Intervenors' Mot. at 15.  In *Blue & Gold Fleet*, the Federal Circuit held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  492 F.3d at 1313.  In short, a bidder may not stay silent about a flaw in a solicitation in the hopes either of winning a contract or, alternatively, protesting the content of the solicitation request in the event it fails to receive an award.  Defendant-intervenors "freely acknowledge [they] are asking this [c]ourt for an extension of the [w]a[iv]er [r]ule that was announced in *Blue and Gold Fleet*."  Hr'g Tr. 56:1-4 (Mar. 21, 2011).  The extension defendant-intervenors seek is not supported by the government — for very good reasons.

Unlike the plaintiff in *Blue & Gold Fleet*, Vanguard does not object to the terms of FEMA's solicitation, but rather to how FEMA evaluated the proposals.  Vanguard did not hide its grounds for protest; to the contrary, it placed them before GAO in a timely manner, albeit unsuccessfully in the end, after two recommended reconsiderations and reevaluations.  The

---

[10]"In a multiple-award contract, prejudice analysis must take into account the impact of the error on all the awards, including whether the correction of an error 'might not only improve the protester's evaluation, but diminish that of a current awardee, or even eliminate that awardee from further consideration altogether.'" *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 366 (2009) (analyzing prejudice as a factor in deciding whether to grant injunctive relief) (citing *Serco*, 81 Fed. Cl. at 501 (same)).

Defendant-intervenors request that this court extend *Blue & Gold Fleet*'s waiver rule to cover a circumstance where (1) a solicitation was *not* defective, (2) an agency made an award, (3) a bidder filed a post-award protest with GAO on the ground that the agency's evaluation process was allegedly flawed, (4) GAO recommended that an agency re-evaluate proposals, but concurrently dismissed one or more aspects of the bidder's protest, and (5) the agency implemented GAO's recommendations but did not seek new proposals for a contract. Specifically, defendant-intervenors urge that a protestor in that setting which wished to preserve the objections GAO did not adopt was obliged either to renew its objections before GAO (on a pre-corrective-action basis) or file a protest in this court and seek to interrupt the corrective action before it occurred.  Given the posture of this particular protest, defendant-intervenors argue that, after GAO's first decision, Vanguard was obliged to object to FEMA's reevaluation before FEMA announced the awardees, either by asking for reconsideration by GAO or by filing a complaint in this court.

Defendant-intervenors cite numerous GAO opinions which supposedly offer support for their position, but none of the fact patterns addressed in those opinions are similar to Vanguard's situation.  *See* Def.-Intervenors' Mot. at 16-17 (citing *Northrop Grumman Info. Tech., Inc.*, B-400134.10, 2009 CPD ¶ 167, 2009 WL 2620070 (Comp. Gen. Aug. 18, 2009); *Domain Name Alliance Registry*, B-310803.2, 2008 CPD ¶ 168, 2008 WL 4224768 (Comp. Gen. Aug. 18, 2008); *L&N/MKB, Joint Venture*, B-403032.3, 2010 CPD ¶ 298, 2010 WL 5142791 (Comp. Gen. Dec. 16, 2010); *Earth Res. Tech., Inc.*, B-403043.2, 2010 CPD ¶ 248, 2010 WL 4304182 (Comp. Gen. Oct. 18, 2010); *Caddell Constr. Co. Inc.*, B-401281, 2009 CPD ¶ 130, 2009 WL 1771287 (Comp. Gen. June 23, 2009)).

These GAO decisions involve interpretations of 4 C.F.R. § 21.2(a), which governs the time for filing GAO bid protests.  *See, e.g.*, *Earth Res. Tech., Inc.*, B-403043.2, 2010 CPD ¶ 248, 2010 WL 4304182, at *4 (protest held untimely because the protestor "knew or should have known of the basis of protest as a consequence of . . . receiving the . . . letter [explaining the agency's decision, and] . . . should have . . . protested the agency's decision . . . within [ten] days of receiving the . . . letter [as required by 4 C.F.R. § 21.2]").

In *Northrup Grumman*, an agency specifically informed a bidder that it would not "hold discussions or permit clarifications" of the bidder's proposal during a solicitation reevaluation. B-400134.10, 2009 CPD ¶ 167, 2009 WL 2620070, at *9.  After the award was made, when the bidder challenged the agency's refusal to hold discussions, GAO found the protest untimely because it was "unreasonable for [the bidder] to await the agency's second award decision without raising any challenge" when the bidder was aware of the alleged defect before the award was made.  *Id.*; *see also Domain Name Alliance Registry*, B-310803.2, 2008 CPD ¶ 168, 2008 WL 4224768, at *5-*6 (holding the same).

In *L&N/MKB, Joint Venture*, following a protest, an agency decided to conduct further discussions with offerors, obtained and evaluated revised proposals, and made a new selection decision.  B-403032.3, 2010 CPD ¶ 298, 2010 WL 5142791, at *2.  A bidder protested after the contract was re-awarded, arguing that the agency "should have limited its corrective action to simply reevaluating the firm's proposals."  *Id.*, at *3.  GAO held the protest untimely because the bidder was aware of the announced ground rules for recompetition before revised proposals had

13

to be submitted, but nevertheless waited until the award had been made to protest the plan for recompetition. *Id.*; *see also Caddell Constr. Co.*, B-401281, 2009 CPD ¶ 130, 2009 WL 1771287, at *3 (bidder's post-award protest of competitor's eligibility for an award was untimely where, prior to the award, prequalified firms were publically identified and the bidder was "on notice . . . of the facts necessary to argue" that its competitor was ineligible for the award).

These decisions by GAO applying its timeliness rule have no persuasive force where the agency's steps to take corrective action are ostensibly in accord with GAO's ruling and applicable regulations, and the flaw in the procurement process, if any, rests with a contention that GAO rejected (and which relates to the agency's initial and subsequent evaluation of offers, not the solicitation itself). The government points out that in this setting, requiring an intervening protest such as that urged as necessary by defendant-intervenors would be met with a persuasive ripeness objection. Hr'g Tr. 79:21 to 80:8. As the government essentially acknowledges, if a post-award protest were untimely, along the lines of defendant-intervenors' argument, a pre-award protest would have to be ripe because "refusing to address . . . [the] pre[-]award protest . . . would be tantamount to denying judicial review." *Centech*, 78 Fed. Cl. at 506; *see* Hr'g Tr. 79:23 to 80:16. Here, had FEMA at any point in taking corrective action modified its solicitation and called for new proposals, then the somewhat extended doctrine of timeliness and waiver represented by the progeny of *Blue & Gold Fleet* in this court could well have been triggered.[11] FEMA did not do so, and that doctrine even as extended accordingly does not apply. The defendant-intervenors thus posit a "heads-I-win, tails-you-lose" overly-extended version of the *Blue & Gold Fleet* rule that has no merit.

## III. AMENDMENT AND SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD

When considering a bid protest, the court adheres to "the standards set forth in section 706 of title 5," the section of the APA that prescribes the scope of judicial review of agency actions. 28 U.S.C. § 1491(b)(4) (referring to 5 U.S.C. § 706). Under the APA, the court may set aside an agency decision if the decision was "arbitrary, capricious, an abuse of discretion, or

---

[11]Instructively, in some circumstances where a corrective action involved a change to the solicitation and new proposals, a challenge to that corrective action *would* necessarily have to be brought and a ripeness challenge would fail. In *Sheridan Corp. v. United States*, 95 Fed. Cl. 141 (2010), *Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303 (2010), and *Centech Group, Inc. v. United States*, 78 Fed. Cl. 496 (2007), awards of contracts were challenged in bid protests filed at GAO. In response to the GAO protests, the agencies took corrective action and sought new proposals for the contracts. The original awardees filed pre-award bid protests in the Court of Federal Claims, challenging the agency's corrective action. *See Sheridan Corp.*, 95 Fed. Cl. at 150; *Ceres Gulf*, 94 Fed. Cl. at 316; *Centech*, 78 Fed. Cl. at 497-98. The government argued that the protestors' claims were not ripe for review, but the court disagreed. *Sheridan Corp.*, 95 Fed. Cl. at 149-50; *Ceres Gulf*, 94 Fed. Cl. at 316-18; *Centech*, 78 Fed. Cl. at 505-06. In each case, the court opined that a post-award challenge would be untimely under *Blue & Gold Fleet*, because *Blue & Gold Fleet* requires bidders to object to the terms of a government solicitation before the award is made. *See Sheridan Corp.*, 95 Fed. Cl. at 150; *Ceres Gulf*, 94 Fed. Cl. at 308; *Centech*, 78 Fed. Cl. at 505.

otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "As a general rule, in determining whether an agency's actions are arbitrary or irrational, the 'focal point for judicial review . . . should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Knowledge Connections, Inc. v. United States*, 79 Fed. Cl. 750, 759 (2007) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (which in turn quoted *Camp v. Pitts*, 411 U.S. 138, 142 (1973))). However, the administrative record of a protested procurement submitted by the agency involved is not always a complete record of documentary materials generated during the procurement and maintained contemporaneously with the occurrence of the salient events or actions associated with the procurement. When the record submitted by the agency is not complete, a motion to correct or supplement the record is appropriate.

Motions to amend or supplement the administrative record in bid protest actions in this court are governed by the Federal Circuit's decision in *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009). Under *Axiom*, "supplementation of the [administrative] record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" *Id.* (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)). "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'" *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735). However, to perform an effective review pursuant to the APA, the court must have a record containing the information upon which the agency relied when it made its decision as well as any documentation revealing the agency's decision-making process. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("[S]ince the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence[,] it may be necessary for the [d]istrict [c]ourt to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard."), *abrogated in an unrelated respect by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *see also Montana Fish, Wildlife, & Parks Found., Inc. v. United States*, 91 Fed. Cl. 434, 440-41 (2010).

A.  *Motions for Partial Dismissal of Those Portions of Vanguard's Complaint That Relate to Supplementation*

Vanguard has challenged the completeness of the administrative record both in its bid-protest complaint and in its motion to supplement the record. In Count One of its complaint, Vanguard alleges that "FEMA unreasonably failed to consider evidence of unreliable cost estimating by the incumbents on their PA TAC contracts that fell within the [five]-year evaluation period [specified in the solicitation]." Compl. ¶ 59. Vanguard contends that "[t]his information was known [by], [or] possessed [by] and . . . available to Ms. Boardwine, the PA TAC [Contracting Officer's Technical Representative], SEB Advisor, a member of the agency evaluation team and[,] upon information and belief, . . . to the S[ource] S[election] A[uthority]."

*Id.*[12]  As Vanguard would have it, "[s]uch negative information on the incumbent contractors was 'too close at hand to ignore' and was required to be considered under federal law." *Id.*  This claim also is at the heart of Vanguard's motion to supplement the record which rests on the contentions that FEMA officials had contravened FAR provisions requiring that performance evaluations be prepared for the contractors on the antecedent PA TAC contracts, that the officials nonetheless had experience and performance information regarding the incumbents, and that the officials wrongfully did nothing to develop or consider that experience and information in taking action in the procurement at issue.  Pl.'s Mot. to Supplement at 1-4.

The government and defendant-intervenors argue that Count One of Vanguard's complaint fails to state a claim upon which relief may be granted because "Vanguard alleges that the [Source Evaluation Board] erred by not considering documents that, under the solicitation, it could not have considered."  Def.'s Mot. at 16; *see also* Def.-Intervenors' Mot. at 33-34.  The government maintains that FEMA's failure to consider the reliability of incumbents' PA TAC contract cost-estimating cannot give rise to a claim upon which relief can be granted because FEMA was not permitted to consider incumbents' "past performance" under subfactor 1(a) of the solicitation, which asked for documentation of bidders' cost-estimating "experience."  *See* Def.'s Mot at 17; *see also* Def.-Intervenors' Mot. at 33-34; AR 105-5216 (GAO's First Decision) ("The agency and intervenors, however, argue that Vanguard's protest, as it relates to subfactor 1A, is misguided because it confuses the concepts of experience and past performance. We agree.").  The government avers that "for evaluation other than of past performance, where the [g]overnment is not permitted to look outside the offers, the 'too close at hand' rule does not apply."  Def.'s Mot. at 17 (citing *Linc Gov't Servs.*, 96 Fed. Cl. 672); *Career Training Concepts v. United States*, 83 Fed. Cl. 215, 232 (2008)).  It contends that "[t]he FAR distinguishes between past performance evaluations and experience evaluations in the procurement of architect-engineer services."  Def.'s Mot. at 18 (citing FAR § 36.602-1(2), -1(4)).  Defendant-intervenors mirror these arguments by asserting that "[i]t is hornbook law that 'experience' and 'past performance' are two separate things" and that subfactor 1(a) only concerned bidders' experience.  Def.-Intervenors' Mot. at 33 (citing John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 737 (3d. ed. 1998)).  GAO concurred with the defendants' position in its first decision, explaining, that "[g]enerally, an agency's evaluation under an experience factor is distinct from its evaluation of an offeror's past performance. . . . [Q]ualitative assessments were properly considered under the [Source Selection Notice's] past performance factor."  AR 105-5216.

Vanguard contests the conclusion that subfactor 1(a) only concerned "experience" and not "past performance."  It noted in its complaint that "the [Source Selection Notice] expressly called for actual reliability and variance data . . . to be a part of th[e] [s]ubfactor [1(a)] evaluation."  Compl. ¶ 61; *see also* Pl.'s Reply at 3.  Vanguard is correct that subfactor 1(a) of the solicitation was multi-faceted.  It asked bidders to identify projects that demonstrated their experience in "developing reliable cost estimates" and required a "detailed explanation of the reasons for any variances on the identified completed projects that exceed plus or minus [ten]

---

[12]Vanguard also points out that Ms. Boardwine was the "Chief of the PA TAC Management Branch of the PA Division [and] served as the single and central point of contact for all PA TAC contractor activity nationwide."  Compl. ¶ 20.

percent between the estimated costs in the proposed solicitation and the actual costs of the completed project." AR 6A-40.2. On this basis, subfactor 1(a) "in part called for actual past performance information for the prior [five] years." Pl.'s Reply at 3. In short, subfactor 1(a) did not ask firms to state merely whether they had cost-estimating experience, but also how reliable those cost estimates were. Although GAO and defendants might be correct that generally experience and past performance are addressed in separate factors, in this instance the text of subfactor 1(a) plainly embraces both an assessment of experience and of cost-estimating performance.

When ruling on a motion to dismiss under RCFC 12(b)(6), the court must construe the allegations of the complaint in the light that is most favorable to the plaintiff. *See Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995); *see also Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989). Vanguard's allegation that certain past performance information was known and available to the FEMA officials who were involved in its solicitation but was ignored even though it was "too close at hand," states a plausible claim, especially in light of FEMA's admitted failure to cause performance evaluations to be made regarding incumbent contractors on the predecessor contracts and its failure to take any measure to fill that gap. *See Linc Gov't Servs.*, 96 Fed. Cl. at 695, 698-700 (finding, among other things, that plaintiff had pled a plausible claim in part because the SSA excluded from consideration allegedly negative past performance by other offerors). In addition, subfactor 1(a) touched on both the incumbent contractors' past experience and performance as to estimating reliability, and the "too close at hand" rule applies to agency's evaluation of past performance. *Career Training Concepts*, 83 Fed. Cl. at 232. Accordingly, defendant's and defendant-intervenors' motions to dismiss Vanguard's allegations regarding FEMA's duty to evaluate the incumbent contractors' experience and performance are unavailing.[13]

---

[13]Defendant-intervenors also contest the validity of Count Two of Vanguard's complaint, which alleges that FEMA, in its factor 4 evaluations, unreasonably evaluated Vanguard's past performance and failed to consider past performance data about incumbent firms which was "too close at hand to ignore." Compl. ¶¶ 64, 65. FEMA has maintained that it did not collect past performance information on the PA TAC II contracts. *See* Def.'s Resp. to Pl.'s Mot. to Supplement ("Def.'s Opp'n") at 10-11 (citing AR 79-4905 (Decl. of Lorine Boardwine (Jan. 22, 2010) ("First Boardwine Decl.")); AR 99-5152 (Supplemental Decl. of Lorine Boardwine (Feb. 25, 2010) ("Second Boardwine Decl.")); AR 90-5041 to 5044 (Decls. of the SEB members, Sherry Savoy (Feb. 4, 2010), Preston Wilson (Feb. 4, 2010), Mary Lowe (Feb. 2, 2010), and Shabbar Saifee (Feb. 16, 2010)); AR 79-4903 (Decl. of Valerie Rhoads, SEB Chairperson)). As a result, Vanguard has asked the court to rule that FEMA should have exercised other means of generating performance evaluations of the PA TAC II incumbent contractors. Defendant-intervenors argue the court "has never applied the 'too close at hand' doctrine to require consideration of raw, unedited, and unsynthesized contract administration data" and applying the doctrine in this case would require the government to "spend months if not years[] collecting and synthesizing tens of thousands of documents that may or may not actually bear on the incumbents' performance." Def.-Intervenors' Mot. at 23, 24 (emphasis omitted). Defendant-intervenors' criticism of Vanguard's further claims about FEMA's failure to develop performance information about incumbent contractors is not persuasive insofar as a motion to

Also, in Count One of its complaint, Vanguard alleges that "FEMA . . . unreasonably found Vanguard's revised Cost Estimating Reliability proposal to be 'very theoretical.'"  Compl. ¶ 60.  The government contends that no claim upon which relief can be granted is stated by that allegation.  Def.'s Mot. at 18.  Defendant-Intervenors put forward a similar contention.  *See* Def.-Intervenors' Mot. at 32-34.  The government elaborates that "Vanguard does not allege that the [Source Selection Authority] abused her discretion, only that there is another reasonable result of the evaluation. . . . [T]his [c]ourt may not . . . substitut[e] its own judgment . . . for that of the [Source Selection Authority]."  *Id.*  The government's description of Vanguard's allegation is misleading.  Vanguard has not conceded that the Source Selection Authority acted reasonably; rather, it specifically characterizes FEMA's evaluation of Vanguard's proposal as "unreasonabl[e]."  Compl. ¶ 60.  Moreover, the legal sufficiency of a complaint does not depend upon whether or not the plaintiff invoked the right "magic words," but instead whether the facts as alleged may plausibly be construed to state a claim that meets the standards of RCFC 12(b)(6).  *See Ashcroft v. Iqbal*, __ U.S. __, __, 129 S. Ct. 1937, 1950 (2009) (clarifying the dismissal standard under Rule 12(b)(6) and noting that while Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions," "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading region of a prior era"); *see also Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006); *Quantum Color Graphics, LLC v. Fan Assoc. Event Photo GmbH*, 185 F. Supp. 2d 897, 904 (N. D. Ill. 2002).  Vanguard's complaint is readily understood to claim that FEMA abused its discretion in evaluating Vanguard's proposal.  The government's and defendant-intervenors' motions to dismiss Vanguard's allegations of a wrongful evaluation are denied.

### B.  *FEMA's Decision to Omit Information Regarding the Incumbent Contractors' Estimating Accuracy or Performance Evaluations*

FEMA concededly failed to generate past performance evaluations of the PA TAC II contractors as required by FAR §§ 36.604, 42.1502(f).  *See* Def.'s Opp'n at 16 ("[T]here are no evaluation worksheets for PA TAC II, which primarily covered the three-year period for evaluation of past performance under factor 4."); AR 79-4905 (First Boardwine Decl.) ("[T]he Quality Assurance Surveillance Plan . . . and applicable FAR clauses were not incorporated into the [PA TAC II] contract awards; therefore, past performance information was not collected."); AR 99-5153 (Second Boardwine Decl.) ("[T]here is no past performance information on PA TAC II, particularly that which is related to the accuracy of developing thousands of costs estimates, that I could have made available to the [Source Evaluation Board].").

In its first decision, GAO recognized that "FEMA [had] failed to incorporate any mechanism for measuring performance under [the PA TAC II] contracts" and that FEMA's "lack of oversight" was "troubling."  AR 105-5218 (GAO's First Decision).  GAO did not act on FEMA's failure to collect required performance information or to generate PPQs as a substitute. GAO did, however, sustain Shaw-Parsons' protest that FEMA unreasonably "failed to consider the PPQs it received regarding Shaw-Parsons' performance [on different contracts], as well as

---

dismiss is concerned.  Vanguard has stated potentially viable claims; the salient question is whether those claims have validity, first with respect to Vanguard's motion to supplement the administrative record and, second, on the merits.

those of the other firms."  AR 105-5209 (GAO's First Decision).  Although FEMA had also failed to complete Past Performance Questionnaires for all of the incumbent PA TAC II contractors, PPQs existed for some firms regarding work on other contracts.  FEMA claimed that it had not considered available PPQs because "PPQs did not match the factors for evaluation under the [Source Selection Notice]" and because considering the PPQs "would have been unfair given that the agency did not receive PPQs for some references for some firms and some of the PPQ responses addressed firms' performance under individual task orders, rather than the firms' overall contract performance."  AR 105-5211.  Nonetheless, GAO decided the existing PPQs had to be considered because omitting them "would be at odds with the very nature of the 'close at hand' principle. . . . [O]nce [FEMA] had the PPQs, it could not simply ignore them."  AR 105-5212.  FEMA's past performance evaluation was therefore unreasonable because "the agency fail[ed] to give meaningful consideration to all the relevant past performance information it possesse[d]."  AR 105-5209 (citing *DRS C3 Sys., LLC*, B-310825, B-310825.2, 2008 CPD ¶ 103, at 22 (Comp. Gen. Feb. 26, 2008)).

Throughout the proceedings before GAO and then before the court, FEMA has offered little explanation as to why it ignored incumbent firms' past performance and experience under the PA TAC I and II contracts when making awards under PA TAC III.  The closest FEMA came to such an explanation was a statement in the Second Boardwine Declaration, submitted to GAO on February 25, 2010, as follows:

> In late 2009, the FEMA's PA Division began collecting information regarding projects developed using CEF [FEMA's Cost Estimating Format].  By analyzing the data, FEMA will have valuable information [on] the accuracy of the cost estimates being developed using CEF, and will be able to begin to draw conclusions on the cause(s) of inaccurate cost estimates.  At this time, the information remains unavailable for dissemination.

AR 99-5152 (Second Boardwine Decl.).  Lorine Boardwine had significant responsibilities both with the PA TAC program and the Source Evaluation Board.  She was the PA TAC III's Source Evaluation Board Advisor, the Contracting Officer's Technical Representative for the PA TAC Program, and the designated point of contact for incumbents' PA TAC II PPQs.  *See* AR 98-5121, 5121 n. 7 (Vanguard's Second Comments to the Agency Report (Feb. 22, 2010)); Def.'s Opp'n Ex. A (Third Decl. of Lorine Boardwine (Feb. 18, 2011)) ¶ 2.

Ms. Boardwine did not complete any PPQs for the PA TAC II contract.  *See* AR 98-5121.  Former FEMA employee Martin Altman declares that he provided "TAC Evaluation Worksheets for all of the PA TACs working in the State of Florida" to Ms. Boardwine and that "[t]he instructions on the TAC Worksheets required the forms to be completed and sent to Ms. Boardwine . . . on a quarterly basis."  Pl.'s Mot. to Supplement Ex. 1 (Decl. of Martin Altman (Jan. 3, 2011)) at 1.[14]  These Worksheets apparently related to work accomplished under

---

[14]The TAC Worksheet forms did not specify a specific contract or contractor, but covered the overall past performance of the PA TACs on the particular disasters indicated on the form.  Mr. Altman avers that from 2005 until January 2009, he served as the Infrastructure Branch

the PA TAC I contracts, some of which was still underway in 2009.[15]  Yet, Ms. Boardwine focused on the PA TAC II contracts, maintaining that "[t]here is no central repository for past performance assessments for the . . . PA TAC II awards," AR 79-4905 (First Boardwine Decl.), and that it is "inaccurate" to say that there is any "past performance information that could have been provided to the Source Evaluation Board . . . for the PA TAC III procurement."  AR 99-5152 (Second Boardwine Decl.).

Ms. Boardwine's declarations submitted to GAO and this court amount to post-hoc rationalizations of FEMA's decision neither to generate nor to consider agency information on incumbent past performance when awarding the PA TAC III contracts.  Among other things, she objected to drawing any inference that the PA TAC III contract was to be performance-based.  *See* AR 99-5153 (Second Boardwine Decl.) ("PA TAC III will not be performance-based.  This decision was made in acknowledgment of the difficulty of evaluating the performance of the PA TACs. . . . [S]atisfactory performance can be established only at the end of a project . . . [but i]n many instances, the PA TAC awards have expired by the time the projects are complete, thereby precluding the opportunity for an accurate performance assessment . . . .").  This position was not uniformly accepted within FEMA.  A report by the Department of Homeland Security's Office of the Inspector General ("IG") notes a disagreement on whether or not the PA TAC II contracts were performance based.  "According to the Alternate PA[ ]TAC COTR, there should be expectations established and monitoring of contractor performance.  The Alternate PA[ ]TAC COTR said that the former PA[ ]TAC COTR believed that these contracts were not performance based, but the Alternate PA[ ]TAC COTR strongly disagreed with that position.  The PA[ ]TAC contract states that the task orders awarded under the three base contracts will be performance based."  Pl.'s Mot. to Supplement Ex. 10 (OIG-11-02 Report (Oct. 21, 2010) ("IG's Report")) at

---

Chief for the Florida Long Term Recovery Office, first in Orlando and then in Lake Mary, Florida.  Altman Decl. ¶ 2.  He also states that he "was the Task Monitor responsible for administering and managing the PA TACs as they were providing support for disasters in the State of Florida," *id.*, and that during that service he provided Ms. Boardwine with TAC Evaluation Worksheets for all of the PA TACs working in the State of Florida.  *Id.* ¶ 5.

[15]Mr. Altman explained that, according to his records, during his service as Task Monitor from 2005 until January 2009, "the PA TACs were funded under two contract vehicles called PA TAC I . . . and PA TAC II . . . .  The TAC Worksheet forms did not identify a specific contract vehicle but covered the overall past performance of PA TACs on the disasters indicated on the form."  Pl.'s Mot. to Supplement Ex. 1 at ¶ 5.  Ms. Boardwine claims that "[w]hen funding ran out for an open PA TAC I task order for which work was incomplete, FEMA cancelled the work under PA TAC I and issued a new task order under PA TAC II."  Def.'s Opp'n Ex. A at ¶ 9 (Third Boardwine Decl.).  Although Mr. Altman states that he provided TAC worksheets to Ms. Boardwine without knowledge of whether a task order was funded under PA TAC I or PA TAC II, Pl.'s Mot. to Supplement Ex. 1 at ¶ 5, Ms. Boardwine avers that "[o]nce FEMA transferred the work from PA TAC I to PA TAC II, performance was no longer measured through an evaluation tool similar to the PA TAC evaluation worksheet, since the new QASP and evaluation took had not been incorporated in the PA TAC II contracts."  Def.'s Opp'n Ex. A at ¶ 9 (Third Boardwine Decl.).

12.  Saliently, the IG's Report states that "FEMA officials did not answer our request for an explanation as to why performance expectations were not established for the task orders or why contractor performance was not evaluated."  *Id*.

## C.  *The GAO Reports and the IG's Report*

Vanguard urges the court to add the two GAO reports and the IG's Report to the administrative record.  Pl.'s Mot. to Supplement at 15-17.  The GAO reports were issued in February 2008 and December 2008, respectively, and address the accuracy and reliability of cost-estimates provided by or for FEMA.  For example, GAO Report 08-301 states, "FEMA officials told us that at 90 days . . . after the declaration the overall estimate of costs related to any given noncatastrophic natural disaster is usually reasonable, . . . defined as within [ten] percent of actual costs.  However, our analysis of FEMA's data for the 83 noncatastrophic natural disaster declarations from 2000 to 2006 . . . was not consistent with this."  Pl.'s Mot. to Supplement Ex. 3 (GAO Report 08-301: Disaster Cost Estimates (Feb. 2008) ("First GAO Report")) at 3; *see also id*. at 9, 14-15.  Neither report names specific PA TAC contractors, although the GAO reports indicate that necessarily much of the technical assistance work in responding to disasters was done by contractors.  FEMA's response to GAO Report 09-129 states that "[t]he [Hurricane Katrina and Rita] disaster was primarily staffed with Technical Assistance Contractors (TAC) after the disaster struck. . . .  [M]ost of the TACs now staffing the disaster have been [t]here an average of over two years. . . .  [D]ay to day PA operations for Hurricanes Katrina and Rita are still handled primarily by TACs."  Pl.'s Mot. to Supplement Ex. 4 (GAO Report 09-129: Disaster Recovery (Dec. 2008) ("Second GAO Report")) at 54 (Letter from Jerald E. Levine, Director, Departmental Audit Liaison Office, Department of Homeland Security, to Stanley J. Czerwinksi, Director, Strategic Issues, GAO (Dec. 11, 2008)).

Among other things, the IG's Report discusses "[i]mprovements [n]eeded in FEMA's [m]anagement of [PA TAC] contracts."  IG's Report at 1.  It explained, "FEMA was unable to determine whether the PA[ ]TAC contractors performed their responsibilities or if the federal government received a fair return for PA[ ]TAC services contracts."  *Id*. at 10.  The IG's Report recommended that FEMA "develop performance and evaluation criteria" for the PA TAC II contracts and noted that "FEMA concur[red] with [its] recommendation."  *Id*. at 14.

The government objects to the addition of the GAO reports on the ground that they were not part of the record considered by the agency.  *See* Def.'s Opp'n at 19 (citing AR 63-4739 (Letter from Jean Hardin to Edward Goldstein, Esq., GAO Procurement Law Control Group (Jan. 6, 2010)) ("The SEB panel chair acknowledged she did not consider the reports.")).  The government further argues that the information in the GAO reports concerned a time period prior to the three-year past performance evaluation window in factor 4, and thus could not have been considered by the agency under the solicitation.  *See* Def.'s Opp'n at 20-21.  Finally, the government asserts that "[t]he [GAO-09-129] report relates only to FEMA's management, not the performance of the incumbent contractors," *id*. at 19, and that the GAO-08-301 report "attributed the deficiency [in cost-estimating] to FEMA."  *Id*. at 21.  Vanguard argues that the GAO reports "prove that incumbent adverse cost estimating and performance information [was] readily available to the [Source Selection Board] Advisor [and] that [it] was too close at hand

and should have been available to and considered by the [Source Selection Board]."  Pl.'s Reply at 12.

The GAO reports were made part of GAO's record on December 7, 2009, in advance of GAO's First Decision.  Those reports deal with the accuracy and reliability of cost-estimates prepared by or for FEMA.  The time periods discussed in the GAO reports are also no barrier to consideration, as subfactor 1(a) considered experience with and past performance of cost-estimating going back five, rather than three, years.  *See* AR 6A-40.2 (Amended Source Selection Notice).

The government also objects to the addition of the IG's Report.  See Def.'s Opp'n at 21-22 ("[T]he IG's [R]eport . . . did not exist until two business days prior to the last source selection authority decision. . . .  There is no evidence that the SSA or any of the SSB members received a copy of the report . . . or considered it as part of the source selection decision.").  Nonetheless, FEMA itself appears to have attached a portion of the IG's Report to an agency report it submitted to GAO.  *See* Pl.'s Mot. to Supplement at 17.  Regarding the IG's Report, Vanguard contends that "[w]hether the IG['s R]eport . . . was available to the [Source Selection Board] is not the issue.  While FEMA asserts that there is no formal past performance information on the PA TAC II contract, the IG['s] Report shows that substantial data on the performance on the PA TAC II was sent directly to the COTR, Ms. Boardwine. . . .  [T]he IG['s R]eport directly addresses the availability of performance information on [the] PA TAC II program to the SEB Advisor and COTR."  Pl.'s Reply at 13.

FEMA did not consider incumbents' estimating-reliability and past performance information when awarding the PA TAC III contract and has justified its omission by claiming there was no past performance information on the PA TAC II contract that it could have considered.  That such information existed in some form is shown by the GAO reports and the IG's Report because the information was incorporated in a limited fashion in the GAO reports and the IG's Report.  Moreover, knowledge of the reports was not restricted narrowly as shown by the fact that FEMA was involved with, and responded to, the GAO reports and the IG's Report, as they were ultimately published.  Ms. Boardwine necessarily had to be implicated in FEMA's role with GAO's and the IG's activity.  In addition, the GAO reports played a part in GAO's final decision and correlatively in FEMA's first reevaluation in assessing PPQs that had been before the SEB but ignored.  *See supra*, at 5-6 (describing GAO's First Decision and FEMA's resulting reevaluation).  As a consequence, the GAO reports and the IG's Report are properly included in the administrative record of this procurement, and Vanguard's motion to supplement the record will be granted in that regard.  *See Northeast Military Sales, Inc. v. United States*, __ Fed. Cl. __, __, 2011 WL 1740600, at *3-*4 (Apr. 15, 2011).

## D. *Vanguard's Discovery Requests*

### 1. *PA TAC 1 worksheets and other documentary materials.*

Vanguard has asked for an extensive list of documents to be added to the administrative record, including TAC evaluation worksheets and almost any reports, worksheets, documents, and communications that bear on the past performance of incumbent PA TAC contractors.  *See*

Pl.'s Mot. to Supplement at 22-27.  Vanguard urges that these documents be included on the ground that "[i]nformation available to an agency on an incumbent's performance of a predecessor contract when evaluating a [nearly] identical follow-on contract is legally required to be considered because it would be '[] unfair to the agency and to other competitors and thus inconsistent with the competitive procurement system' to ignore such highly relevant information." *Id.* at 18 (quoting *Continental Marine of San Diego, Inc.*, B- 249858, B-249858.2, B-249858-.3, 93-1 CPD ¶ 230, 1993 WL 86794, at *4 (Comp. Gen. Feb. 11, 1993); and citing *G. Marine Diesel; Phillyship*, B-232619, B-232619.2, 89-1 CPD ¶ 90, 1989 WL 240304 (Comp. Gen. Jan. 27, 1989); *GTS Duratek, Inc.*, B-280511.2, B-280511.3, 98-2 CPD ¶ 130, 1998 WL 840923 (Comp. Gen. Oct. 19, 1998)).

Information on PA TAC II incumbents' past performance is and was obviously available to FEMA.  However, it is available in raw form and has not been organized or presented in a comprehensive manner.  Each individual TAC worksheet appears to be a snapshot of a particular project at a particular time.  When awarding the PA TAC III contract, the SEB manifestly did not consider this material, and, indeed, if the declarations of Ms. Boardwine and the SEB members are to be credited, endeavored to avoid considering it.  Although FEMA was legally required to conduct past performance evaluations and to consider those evaluations when awarding the PA TAC III contracts, "overall" past performance evaluations were never made.  AR 79-4905 (First Boardwine Decl.).[16]  The court cannot consider evaluations that FEMA never created and cannot consider reams of documents which would comprise part, but only a part, of the raw material needed to prepare evaluations.  This is so even though the Technical Advisor to the SEB, who was also the Chief of the Public Assistance (PA) Technical Assistance Contract (TAC) Management Branch of the Public Assistance Division, and who received the PA TAC Worksheets over a period of years, had to have a very good sense of the performance of the several incumbent contractors working on PA TAC I and II.  Why she did not prepare PPQs based on that detailed experience is not explained.

The documents Vanguard proposes to add to the administrative record neither illuminate "the factors that were considered" by FEMA when it awarded the PA TAC III contracts nor how FEMA "construct[ed] . . . the evidence" upon which it did rely.  *Citizens to Preserve Overton Park*, 401 U.S. at 420.  Whether cost-estimating reliability and past performance information was available speaks to the issue of whether or not FEMA's evaluations were arbitrary and capricious, but to substitute voluminous amounts of atomistic raw data for holistic performance evaluations would run the risk of "convert[ing] the arbitrary and capricious standard into effectively de novo review."  *Axiom Res. Mgmt.*, 564 F.3d at 1380 (internal quotation marks omitted).  Accordingly, the court denies Vanguard's request for FEMA to produce worksheets and related documents concerning the PA TAC I and II contracts.

---

[16]In a declaration made February 25, 2010, the Chairperson of the SEB, Valerie Rhoads, stated that "[p]ast performance has other components than just cost estimating skills."  AR 99-5149 (Rhoads Decl.).

2. *Depositions.*

Vanguard requests a deposition of Ms. Boardwine because "her declarations raise more questions than answers" and because Vanguard aims to establish that Ms. Boardwine had personal knowledge about the incumbent contractors' estimating reliability and past performance. Pl.'s Mot. to Supplement at 27. The government avers that there is nothing for Vanguard to discover: "Ms. Boardwine stated in her February 25, 2010 supplemental declaration[, *i.e.*, the Second Boardwine Declaration,] that she did not have any recollections of any concerns by FEMA task monitors with the accuracy of incumbents' cost-estimates. . . . Her recollection is fully supported by the documents in the record and . . . evaluation worksheets." Def.'s Opp'n at 33 (citing AR 99-5152).

The government's objection is unconvincing. As Vanguard notes, the government continually relies on Ms. Boardwine's three declarations to support the proposition that FEMA did not have cost-estimating reliability and past performance information on the PA TAC II incumbent firms. *See* Pl.'s Reply at 14. Each of Ms. Boardwine's declarations are post-hoc interpretations, recollections, and excuses, as are the declarations by each of the SEB members that the government has caused to be included in the record of this post-award protest. Vanguard has responded by putting forward declarations of a number of persons involved or familiar with FEMA's PA TAC contractual work, some of which were part of the record of protests before GAO[17] and others of which have been presented in the protest pending before the court.[18] This response by Vanguard is perhaps understandable in the circumstances because of the declarations upon which the government heavily relies, but it primarily serves to emphasize that the court is being confronted with a bid protest which is being litigated largely on the basis of post hoc declarations that were not before FEMA at the time it made the initial award of contracts in this procurement, and, in significant part, were not and could not have been before FEMA when it made its decisions upon reevaluation based upon GAO's recommendations. This state of affairs is not tenable as a legal matter. Statutorily, bid protests in this court are to proceed in accord with "the standards set forth in section 706 of title 5," 28 U.S.C. § 1491(b)(4), not on the basis of a new record addressed by the parties in court.

Ms. Boardwine's declarations are at the core of this unsatisfactory mode of proceeding. Her declarations are more significant for what they do not state than what they aver directly. For example, she declared, "While I do communicate with PA TAC Task Monitors on a variety of PA TAC issues, most issues are in regard to the performance or conduct of individual technical specialists deployed by the PA TACs, rather than overall PA TAC performance by the Prime Contractors." AR 99-5152 (Second Boardwine Decl.). The use of the term "most" invites the question of what broader PA TAC issues Ms. Boardwine encountered. As Vanguard observes, Ms. Boardwine did not volunteer information about "her knowledge of unreliab[le] cost

---

[17]*See, e.g.*, AR 98.01-5125 to 5126 (Decl. of Daniel Craig); AR 98.01-5127 to 5128 (Supp. Decl. of Steven Glenn).

[18]*See, e.g.*, Pl.'s Mot. to Supplement Ex. 7 (Third Decl. of Steven Glenn (Feb. 9, 2011)), Ex. 8 (Decl. of Teresa Carter (Feb. 9, 2011)), Ex. 9 (Decl. of Bruce Lockwood (Feb. 9, 2011)).

estimating [on the PA TAC I contract]. . . . [or] whether she had direct knowledge of or ready access to adverse performance [information] in . . . TAC Evaluation Worksheets that were e-mailed or faxed to her."  Pl.'s Reply at 14-15.

"[A] reviewing court has [the] power to require an explanation" for an agency's actions. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001).  Although "[an] agency decision is entitled to the presumption of regularity," "that presumption [can be] rebutted by record evidence suggesting the agency decision [wa]s arbitrary and capricious."  *Id.*  The existence of the GAO reports and the mystifying absence of PPQs related to the PA TAC I and PA TAC II contractors suggest that incumbent estimating-reliability and past performance information may have been consciously disregarded by FEMA.  Evidence that FEMA disregarded past performance information in its possession would indicate that it had chosen PA TAC III awardees in an arbitrary and capricious manner.[19]  One alternative available to the court would be to invoke *Florida Power & Light*, 470 U.S. at 744, and to remand the procurement action to FEMA with a direction to address specifically the causes for the absence of incumbent contractor information, including the failure to provide PPQs if no formal evaluations were available, and, potentially, to require that, at a minimum, PPQs be prepared, a fresh analysis be performed, and a new decision made using the resulting materials.  The court must, however, take into account that this procurement has already been suspended for a considerable time as a result of the prior proceedings before GAO.  Another alternative available to the court is to obtain directly the testimony of the pertinent FEMA officials, as was approved in *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1338.  That mode of proceeding has the advantage that it would give effect to "the need for expeditious resolution of the action," 28 U.S.C. § 1491(b)(3), which the governing statute requires this court to take into account.  *See Bannum*, 404 F.3d at 1356.  As a consequence, to move this litigation forward, the court will allow Vanguard to conduct a four-hour deposition of Ms. Boardwine.  *See Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1338-39; *Citizens to Preserve Overton Park,* 401 U.S. at 420.

---

[19]There are at least three types of instances in which the agency record of a procurement action may well be incomplete or absent and require further development.  Those situations can arise (1) with allegations of bias, *see Pitney Bowes Gov't Solutions, Inc. v. United States*, 93 Fed. Cl. 327, 332-34 (2010) (concluding that an allegation of bias on the part of a panel member who may have influenced a consensus determination was supported by destruction of the individual members' evaluation sheets); *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, 351-52, 357-58 (2010) (finding that allegations of bias based upon proven exercise of undue influence by Principle Deputy Assistant Secretary of the Air Force for Acquisition was sufficient to require supplementation of the record), *amended on reconsideration in part by*, __ Fed. Cl. __, __ 2011 WL 311035 (Feb. 2, 2011) (finding that four out of thirty supplementary documents were not required for judicial review), (2) with organizational conflicts of interest, *see Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 770-73 (2006), and (3) with potential application of the "too close at hand to ignore" doctrine, where a court may well have to look outside the agency record to determine tentatively what, if anything, the agency had in hand but did not consider, as this case illustrates.

Vanguard also seeks to depose Elizabeth Zimmerman to discover her "historical knowledge of the PA program." Pl.'s Mot. at 28. Ms. Zimmerman was the PA TAC III Source Selection Authority and the Deputy Associate Administrator of the Office of Response and Recovery. *See* AR 135-5678; AR 136-5694. The government objects to Ms. Zimmerman being deposed, claiming "[t]here is nothing to discover." Def.'s Resp. at 34. Deposition testimony ought to be ordered only in "rare circumstances." *Florida Power & Light*, 470 U.S. at 744. Ms. Zimmerman has not provided declarations nor has she allegedly been responsible for any action or omission by FEMA which requires an explanation. She shall not be deposed.

### 3. *Declarations.*

Vanguard finally seeks the admission of declarations by Steven Glenn, Martin Altman, Daniel Craig, Teresa Carter, and Bruce Lockwood, describing their personal experiences with the PA program. These declarations contain statements concerning the performance of PA TAC I and II contractors and relate to whether FEMA had past performance information on the PA TAC contractors. *See, e.g.*, Pl.'s Mot. to Supplement Ex. 9 ¶ 3 (Decl. of Bruce Lockwood (Feb. 9, 2011)) (describing Mr. Lockwood's experience producing cost-estimates for [***]), Ex. 8 ¶¶ 2, 8, 12-13 (Decl. of Teresa Carter (Feb. 9, 2011)) (describing Ms. Carter's experience producing cost-estimates for [***] and characterizing PA TAC cost-estimates as "unreliable"), Ex. 6 ¶ 3 (Decl. of Daniel Craig (Feb. 9, 2011) (averring that Ms. Boardwine, in her role as Contracting Officer's Technical Representative, would have been aware of incumbents' past performance), Ex. 5 ¶¶ 6-9 (Decl. of Steven Glenn) (explaining Mr. Glenn's belief that Ms. Boardwine was aware of PA TAC contractor performance); Pl.'s Mot. Ex. 1 ¶¶ 2, 3, 5 (Decl. of Martin Altman (Jan. 3, 2011)) (stating that Mr. Altman provided Ms. Boardwine with TAC Evaluation Worksheets for all of the PA TACs working in Florida for the period between 2005 and 2009).

The government argues that each of the declarants "are biased by a personal financial interest in seeing Vanguard awarded a part of this $2 billion procurement." Def.'s Opp'n at 27. It also claims that Mr. Altman's declaration should be stricken on an unrelated ground. *See* Def.'s Resp. at 27-28.

The declarations by Daniel Craig, Teresa Carter, and Bruce Lockwood made in February 2011 were never before FEMA or GAO. Vanguard urges the court to admit the Craig, Carter, and Lockwood declarations for their "evidentiary value." Pl.'s Mot. to Supplement at 28-29. This new evidence is not necessary for the court to determine whether FEMA's award decision was arbitrary and capricious; to consider these declarations would border on *de novo* review of FEMA's actions. While the Craig, Carter, and Lockwood declarations discuss what information might have been available to Ms. Boardwine, the more appropriate path to determining what information Ms. Boardwine had is through her deposition.[20]

---

[20]Specifically also, for the reason explained *supra*, at 25 n.19, the various and numerous post hoc declarations bearing on information available to FEMA's SEB regarding the incumbents' cost-estimating reliability and past performance should, in all events, be added to the record of this case, albeit not to the agency record, because they address the need *vel non* for supplementation of that record.

The declaration of Mr. Altman and the first declaration by Mr. Glenn were put before GAO but were not included in the administrative record.  *See* Pl.'s Mot. at 15, 17.  RCFC Appendix C, ¶ 22(u) specifies that "[t]he core documents relevant to a protest case may include, as appropriate . . . the record of any previous administrative or judicial proceedings relating to the procurement, including the record of any other protest of the procurement."  As this court recognized in *Holloway & Co. v. United States*, 87 Fed. Cl. 381, 392 (2009), "the provisions of RCFC Appendix C, ¶ 22(u) might be viewed as being inconsistent with the record-review task with which this court is charged by the Tucker Act as amended by the ADRA [Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320 §§ 12(a), 12(b), 110 Stat. 3870, 3874-75 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491(b))]."  This tension arises because "*[p]ost-award* protests before GAO that occur prior to protest proceedings in this court necessarily will involve materials that were not before the agency at the time of award," a circumstance attributable to GAO's "recei[pt of] extra-record argumentative and evidentiary submissions."  *Id.*  In this instance, both the government in its agency report and briefs and the several protestors in their submissions put before GAO materials that were not part of the original procurement record. GAO acted on the basis of the whole record before it, including the "new" materials, to recommend that FEMA undertake two separate corrective actions, which the agency accomplished.  The revised procurement decision pending for review at this juncture is the result of those proceedings.

RCFC Appendix C, ¶ 22(u) "ensur[es] that the full record of all proceedings related to the procurement is before the court for review."  *Holloway*, 87 Fed. Cl. at 392.  In addition, by law, the court is required to include in the record the agency reports provided by GAO as well as the decisions made by GAO:

> In any such action based on a procurement or proposed procurement with respect to which a protest has been filed under this subchapter, the reports required by sections 3553(b)(2) and 3554(e)(1) of this title with respect to such procurement or proposed procurement and any decision or recommendation of the Comptroller General under this subchapter with respect to such procurement or proposed procurement shall be considered to be part of the agency record subject to review.

31 U.S.C. § 3556.  Accordingly, whatever materials were before GAO shall also be incorporated into the administrative record before the court.  That is not to say, however, that all such GAO-related materials will be given credence.  Post hoc declarations and arguments will be discounted or disregarded.[21]  The first two Boardwine declarations and the declarations by FEMA's SEB

---

[21]In *Holloway*, the court took materials that had been presented in GAO proceedings into the administrative record, relying on RCFC Appendix C, ¶ 22(u).  87 Fed. Cl. at 391-92.  The court, however, carefully noted that post hoc explanations or "clarifications" in that material would be discounted.  *Id.* at 392.  Other judges of this court have indicated that the administrative record should not include "materials created or obtained subsequent to the agency's

members were attached to agency reports provided by FEMA to GAO.  *See* AR 79-4898 to 4905; AR 90-5032 to 5049; AR 99-5145 to 5153.  Consequently, those declarations are part of the record.  The post hoc rationalizations and statements in the declarations will be treated as the law requires.  *See PGBA, LLC v. United States*, 60 Fed. Cl. 196, 204 (2004) ("In examining this expanded record, the [c]ourt is mindful that it must critically examine *any* post hoc rationalization." (emphasis modified) (citing *Citizens to Preserve Overton Park*, 401 U.S. at 420; *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519 (1978); *Co-Steel Raritan, Inc. v. International Trade Comm'n*, 357 F.3d 1294, 1316 (Fed. Cir. 2004))), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).

## IV.  MOTION TO REMAND

Vanguard makes an alternative request to remand this matter to FEMA.  The Supreme Court has explained, "If . . . the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Florida Power & Light*, 470 U.S. at 744.  Vanguard has raised serious questions about whether FEMA considered all relevant incumbent cost-estimating and past performance information when it awarded the PA TAC III contracts.  However, these questions have not yet been fully answered.  The court therefore reserves decision on remand of this matter to FEMA, should that remedy be justified by facts, or the absence of facts, of record.

## CONCLUSION

For the reasons stated, the government's and the defendant-intervenors' motions to dismiss are DENIED.  The plaintiff's motion to supplement the administrative record is GRANTED IN PART and DENIED IN PART.  GAO Report 08-301, GAO Report 09-129, the IG's Report, and the materials encompassed within the record before GAO in the three protests of the procurement before that entity are made part of the administrative record.  The plaintiff is permitted to conduct a four-hour deposition of Ms. Lorine Boardwine.

The parties shall file a joint status report on or before June 1, 2011, proposing a schedule for briefing dispositive motions.

---

decision."  *Allied Tech. Grp., Inc. v. United States*, 92 Fed. Cl. 226, 229-230 (2010).  This difference in approach may have no practical effect because the same result would likely occur with either mode of proceeding.

Notably, however, an exception to both approaches may arise in a case such as this where the *outcome* of the procurement changed as a consequence of the agency's action on recommendations made by GAO in the prior proceedings.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge